70 A.3d 497

KELLY RUROEDE, PLAINTIFF–RESPONDENT, v. BOROUGH OF HASBROUCK HEIGHTS, HASBROUCK HEIGHTS POLICE DE-PARTMENT, CHIEF MICHAEL COLANERI, MAYOR ROSE M. HECK, COUNCIL MEMBERS STEPHEN ALTOBELLI, SONYA BUCKMAN, ANTHONY DINANNO, JUSTIN A. DIPISA, AND DAVID GONZALEZ, DEFENDANTS–APPELLANTS.

Argued February 26, 2013—Decided July 1, 2013.

*Dominick J. Bratti* argued the cause for appellants (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Bratti* and *Rebecka J. Whitmarsh,* on the briefs).

*Albert H. Wunsch, III* argued the cause for respondent (*Mr. Wunsch,* attorney; *Paul A. Krauss,* on the brief).

PER CURIAM.

In this appeal, we consider the termination of a police officer's employment in a non-civil service jurisdiction. The statutory framework governing the proceedings under review is set forth in *N.J.S.A.* 40A:14–147 to –151.

Plaintiff Kelly Ruroede, a police officer who was at the time on temporary sick leave, was suspended without pay and ultimately terminated from his employment based on numerous charges originally stemming from an off-duty verbal and physical altercation outside a restaurant and bar. Following a disciplinary hearing, a neutral hearing officer found that Ruroede's employer, the Borough of Hasbrouck Heights (Borough), carried its evidentiary burden and that termination of Ruroede's employment was appropriate. The Borough adopted that recommendation and terminated him.

Ruroede sought de novo review in the Law Division of the Superior Court. The Law Division declared that the disciplinary hearing deprived Ruroede of due process. Rather than producing live testimony from the complaining witness or any other witness to the altercation at the disciplinary hearing, the Borough had presented statements as part of an internal affairs investigation and testimony from the officer who prepared the internal investigation report. The court, concluding that was inadequate, vacated

Ruroede's termination and remanded the matter for a new disciplinary proceeding. Further, the court placed Ruroede on inactive, paid status,[1] pending a final disposition of the charges, and awarded him back pay. The Appellate Division affirmed the Law Division's judgment.

The Borough's petition primarily questions whether the Law Division acted properly in vacating Ruroede's termination without making independent findings of fact or holding a hearing to supplement the record on the perceived deficiency in its de novo review of this disciplinary action. *See N.J.S.A.* 40A:14–150. The Borough also asks this Court to address whether the Law Division's remedy—altering the suspension to one with pay and awarding back pay—was proper.

For the reasons expressed herein, we reverse the judgment under review. The Law Division erred by vacating the termination and ordering a remand. The Law Division's actions were limited to affirming, reversing, or modifying the disciplinary conviction pursuant to *N.J.S.A.* 40A:14–150. In assessing those options, the court has the flexibility to permit supplementation of the record in its de novo review. *Ibid.* By ordering a remand, however, the Law Division exceeded the statutorily authorized dispositions in these de novo appeals. The statutory scheme is designed to bring police disciplinary actions to a swift, efficient, and final resolution. The Law Division's remand thwarted those salutary goals.

Moreover, while the record in this matter may have benefited from the live testimony of the complaining witness or other eyewitnesses, we conclude that it did contain sufficient, competent evidence to support serious charges filed against Ruroede, and to warrant his termination. Accordingly, we further conclude that reinstatement of Ruroede to inactive status with an award of back pay was in error. Thus, the Appellate Division judgment, which

---

[1] The "inactive status" referred to by the Law Division finds no place in the statutory framework. But, for clarity, we use that label throughout this opinion.

affirmed the Law Division's judgment in all its respects, is reversed.

## I.

We recite the background to the proceedings based on the entirety of the evidence adduced at the municipal disciplinary hearing.

## A.

In October 2007, Ruroede, a police lieutenant with more than twenty-three years of service, was taken to the hospital after passing out. He was diagnosed with a seizure disorder. Dr. David Porter, the attending physician, notified the Hasbrouck Heights Police Department (Police Department) that Ruroede would be unable to work until further notice. As a result, the Police Department placed him on temporary sick leave.

After being released from the hospital, Ruroede left the state to live in Oklahoma with his wife; however, he failed to notify the Police Department of his departure. Unaware of Ruroede's whereabouts, the Police Department made several unsuccessful attempts to contact him in November 2007. In January 2008, the Police Department learned, based on a follow-up letter sent by Dr. Porter, that Ruroede was undergoing additional neurological evaluations. On February 28, 2008, the Department learned, again from Dr. Porter, that Ruroede was completing physical therapy and would be able to return to work in one month.

On March 20, 2008, Ruroede contacted Deputy Chief Robert Kroncke and informed him that he would be unable to return to work due to significant stress. Several days later, on March 24, 2008, Ruroede changed course and informed Kroncke that he had decided to return to his position. Due to the conflicting messages, Kroncke asked Ruroede to provide medical documentation approving his return to service, but Ruroede refused and told Kroncke in that same conversation that he would not comply.

Meanwhile, the previous evening of March 23, 2008, Ruroede was involved in an altercation at Blarney Station, a restaurant and bar in East Rutherford. According to Joseph Kelly, the establishment's bartender, Ruroede was seen wearing a cowboy hat and drinking with two other unidentified men until approximately 1:30 a.m.

As he was leaving the bar, Ruroede passed by two men entering the bar, who were later identified as Captain George Egbert, an officer with the Rutherford Police Department, and Jun Ruales. At the time, Ruroede did not know either of the men, but as they passed each other, Egbert called out, "nice hat" to Ruroede, referencing the cowboy hat. Ruroede acknowledged the comment. Egbert then asked where Ruroede had purchased the hat. Rather than answering the question, Ruroede lifted up his shirt and displayed a police badge and a weapon. Egbert maintains that Ruroede had an automatic pistol in a holster.[2] According to Ruroede's testimony at the hearing, he was only carrying a knife.

Despite varying accounts of what transpired, Ruroede and Egbert ended up in a physical altercation and had to be separated. Ruroede, by all accounts a much larger man than Egbert, grabbed Egbert by the shirt, practically lifting him off the ground. Ruales tried to intervene, explaining that Egbert was a police officer. Despite Ruales' efforts, Ruroede had to be restrained by another man at the scene.

Shortly after the dispute, Egbert contacted Ruroede's police supervisors, as well as the Police Department of East Rutherford, where the incident occurred, to complain about Ruroede's behav-

---

[2] Egbert did not testify at the departmental hearing. His statement, along with the statements of all others interviewed by the internal affairs police officer who investigated this matter, was appended to the Department's internal investigative report of the matter, which was introduced into evidence in the departmental hearing. Captain Joseph Cronin, who prepared the internal investigative report, testified at the departmental hearing. Statements by others appended to the internal investigative report also indicated that Ruroede displayed a gun, described in terms consistent with a handgun privately possessed by Ruroede.

ior. Egbert's account was partially corroborated by Erik
Simpson, a witness who confirmed that there was a physical
altercation outside Blarney Station over the cowboy hat. Simpson
also confirmed that Ruroede had to be restrained and that Rur-
oede continued to make threatening comments as he walked
away.[3]

Ruroede was questioned about the altercation as part of an
internal investigation by superior officers. According to Ruroede,
Egbert was the aggressor in that he made derogatory comments
about Stephanie Castiglione, Ruroede's family friend who was at
Blarney Station that evening. Ruroede initially admitted to lifting
his shirt, displaying his police badge, carrying a knife, and physi-
cally fighting with Egbert. In a later statement, he again de-
scribed Egbert as the aggressor but said that, after Egbert
grabbed Ruroede's arm, he walked away without any physical
altercation after warning Egbert not ever to touch him again.
Both of Ruroede's versions of the events were included in an
internal affairs report submitted to the Police Chief by Captain
Joseph Cronin. Although Castiglione confirmed Ruroede's story
that Egbert made a derogatory comment to her when she and
Ruroede were leaving Blarney Station, no other witness saw
Castiglione present during Egbert and Ruroede's exchange.
Moreover, there was evidence presented that Castiglione was in
her car in the parking lot at the time the dispute arose between
Ruroede and Egbert.

Ruroede was required to submit to a psychological evaluation on
April 4, 2008. Dr. Daniel Schievella, a psychologist who primarily
works with police officers, conducted the evaluation and concluded
that Ruroede was unfit for duty. Dr. Schievella's report set forth
the results of the psychological testing he performed, the back-
ground gathered, prior psychological evaluations, medical informa-

---

[3] Simpson was not called as a witness at the municipal disciplinary hearing.
His statement to an internal affairs police officer investigating the incident was
appended to the internal affairs report admitted into evidence.

tion, and interview results that he evaluated in order to form his opinion that Ruroede was unfit for duty. His report, which was admitted into evidence by consent, detailed the basis for his findings and concluded with the opinion that Ruroede was unfit for duty:

> [T]he present evaluation finds indications that Mr. Ruroede is suffering from organic/brain impairments that would impede his abilities to perform his duties. His present cognitive state would leave him at risk for over-aggressive behaviors, as well as slowness in responding (poor reflexes) and likely impaired judgment. The issue of whether he is at risk for future seizures remain[s] unanswered but would prevent him from safely driving or carrying a weapon.
>
> Due to the above concerns, I find the subject *unfit* for duty.

In response, Ruroede scheduled a psychological evaluation with Dr. Susan Cook, an independent psychologist who works with a variety of patients. Dr. Cook concluded that Ruroede was fit for duty, opining that, even if Ruroede did have aggression issues, attendance at anger management counseling could address them.

Following the internal investigation, the Police Department issued to Ruroede a Notice of Immediate Suspension and Disciplinary Charges (Notice). The Notice alleged that Ruroede violated eleven Police Department Rules and Regulations, including: 3:1.1 (Standard of Conduct), 3:1.11 (Conduct toward Superiors and Subordinate Officers and Associates), 3:1.12 (Obedience to Laws and Regulations), 3:1.29 (Withholding Information), 3:9–1 (Handling of Firearms), 3:9.3 (Off Duty or Secondary Firearm), 3:10.1 (Conduct Towards Public), 3:12.4 (Departmental Investigations–Testifying), and 4:8.4 (Unauthorized Absence). It charged Ruroede with conduct unbecoming a police officer, conduct unbecoming a public employee, disorderly conduct, willful violation of rules and regulations, dishonesty and untruthfulness, and withholding information. The Notice concluded that Ruroede had "violated the implicit standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct," and recommended that Ruroede be suspended immediately without pay pending his termination.

### B.

Ruroede contested the Notice, and a municipal disciplinary hearing was conducted on the nonconsecutive days of May 29, June 5, June 23, and October 8, 2008. The Borough presented oral testimony from Cronin, Kelly, and Captain John DeLorenzo, who testified to the relevant police rules and regulations. The Borough also submitted written evidence. Chief among the exhibits admitted into evidence were the internal investigation report, Ruroede's police record, photographs taken of Blarney Station, and telephone records of Egbert's reports to the Police Department and the East Rutherford Police Department. Additionally, the Borough introduced evidence of Ruroede's other conduct that was noncompliant with departmental rules and regulations prior to the altercation with Egbert, specifically evidence that he left the state without permission while on sick leave and that he had harassed another officer at the police station.

During the first three days of the hearing, Ruroede was represented by counsel. However, due to an attorney's fee dispute between Ruroede and his counsel, the hearing officer permitted the attorney to withdraw in September before the hearing was scheduled to resume in October. Ruroede did not obtain substitute counsel; instead, he chose to represent himself for the remainder of the hearing and elected to testify on his own behalf.

On direct examination, Ruroede explained that he was drinking with several friends at Blarney Station, including Castiglione. He stated that, on leaving the bar, he heard Egbert say to Castiglione, "we don't get p**** like you around here. Why don't [you] come back inside and I'll buy you a drink." Ruroede testified:

> I walked up to him and I said you owe that girl an apology. First I said, what did you say? And he said f\*\*\*\* you. And then that went on for a few minutes. And then he said nice f\*\*\*\*ing hat because I was wearing a cowboy hat, and then I told him you owe her an apology and he declined.
>
> . . . .
>
> There was a lot of name calling going back and forth. And he said I'm the Chief of Rutherford [Police], and I started laughing because Rutherford didn't have a

chief at that time. There was no [C]hief of Rutherford [Police], and I called his bluff and I started laughing at him. And heated words were exchanged and his friend that was there with him, said no, he's the Chief of Rutherford [Police] and went to hand me his card, and the Chief slapped my hand.

. . . .

Captain Egbert slapped my hand down, no, don't give him that card. And I said don't ever f***ing touch me. And at that point, I called him some unsavory words, we got in it heated, and I turned to walk away and he grabbed my arm and that's when I broke his hold on me, and I grabbed his jacket.

. . . .

I told him you don't ever f***ing touch me and I pushed him away.

Asked whether he was carrying a firearm that night, Ruroede responded that he did not have a handgun but was carrying his police badge and a knife. Ruroede said that he lifted up his shirt, exposing his badge, to show that he was a police officer. He also explained that he was a black-belt martial artist and could "choke somebody out" if necessary. In response to a question about whether he had to be restrained by another man at the scene, Ruroede stated, "I would like to see the other male try to restrain me."

Ruroede also called as a witness Castiglione, who corroborated Ruroede's version of the altercation. On cross-examination, however, she conceded that she gave false testimony in a prior hearing to help prevent a police officer who she was dating at the time from being terminated.

On the last day of the hearing, Ruroede and the Borough agreed to finalize the record by admitting their respective psychological reports and submitting closing summations, and both parties thereafter submitted the evidence on October 15, 2008. At that point, the hearing came to a close.

The hearing officer, in a written decision, concluded: (1) the psychological evaluation submitted by the Borough carried more weight considering the expert had familiarity evaluating police officers; (2) Ruroede did not have authorization to go to Blarney Station while on sick leave; (3) Ruroede initiated the dispute with Egbert; (4) Ruroede was carrying a firearm even though he was not authorized to do so; and (5) Ruroede lied to internal affairs

officers about the altercation. In his decision, the hearing officer also discussed Ruroede's disobedience to superior officer direction that preceded the altercation, including his refusal to submit medical paperwork, his decision to leave the state without notifying the Police Department, and the verbal harassment towards fellow police officers. By his actions, Ruroede was determined to have exhibited conduct unbecoming a police officer and public employee, disorderly conduct, willful violations of departmental rules and regulations, dishonesty, untruthfulness, and withholding information. Due to the serious nature of Ruroede's offenses and his untruthfulness during the investigation, the hearing officer recommended termination.

The Borough "accepted, confirmed and ratified" the hearing officer's recommendation and terminated Ruroede's employment by Resolution dated December 9, 2008.

## C.

Ruroede challenged his termination in the Bergen County Superior Court, Law Division. The trial court conducted a one-day hearing during which the Borough was allowed to supplement the record with a restraining order issued in March 2010 requiring Ruroede to surrender all of his registered weapons following an incident of domestic violence against his wife.[4]

After considering the parties' arguments, the hearing record, and the newly submitted restraining order, the court issued a written opinion, concluding that the disciplinary hearing was deficient and vacating Ruroede's termination. The trial court found it problematic that the final day of the hearing took place with Ruroede unassisted by counsel and that the hearing officer relied on written rather than oral testimony from several witnesses.

---

4 Notably, the record was supplemented in the Law Division only to add the restraining order, which included facts that occurred after the conclusion of the disciplinary hearing. No additional testimony was admitted concerning the physical altercation between Ruroede and Egbert.

The court reinstated Ruroede, placing him on "inactive status" with pay, awarded back pay pending a final resolution of the matter, and remanded for a new disciplinary hearing.

## D.

In an unpublished decision dated October 11, 2011, the Appellate Division affirmed. The panel found that the trial court properly reversed Ruroede's termination as the disciplinary hearing did not contain sufficient, competent evidence. Although hearsay evidence is admissible in disciplinary hearings, because, according to the panel, "[t]here [was] no residuum of legal and competent evidence .... it was error for the hearing officer to have made factual findings and conclusions based on those hearsay documents."

The Appellate Division further found that Ruroede's due process rights were violated during the disciplinary hearing, relying chiefly on *Nicoletta v. North Jersey District Water Supply Commission,* 77 *N.J.* 145, 154, 165–66, 390 *A.*2d 90 (1978) (recognizing right to due process protections in administrative disciplinary proceedings implicating reputational liberty interests, including right to confront and cross-examine adverse witnesses). According to the panel, Ruroede should have had the right to cross-examine adverse witnesses. The panel affirmed the trial court's remedy, concluding that it was proper to reinstate Ruroede to inactive status and to require an award of back pay.

We granted the Borough's petition for certification. *Ruroede v. Borough of Hasbrouck Heights,* 209 *N.J.* 597, 39 *A.*3d 200 (2012).

## II.

## A.

In its petition, the Borough argues that the Appellate Division erred by failing to consider whether the municipal disciplinary record contained sufficient, competent evidence or whether the trial court's decision was arbitrary, capricious, or unreasonable

under *In re Disciplinary Procedures of Phillips,* 117 *N.J.* 567, 569 *A.*2d 807 (1990). Additionally, the Borough contends the trial court erred by failing to make any independent findings of fact as required by *N.J.S.A.* 40A:14–150. The Borough relies on the evidence adduced during the disciplinary hearing, as well as the restraining order submitted to the trial court. At bottom, the Borough maintains that the disciplinary hearing did not violate Ruroede's due process rights.

Moreover, the Borough argues that the trial court and Appellate Division imposed an improper remedy by awarding back pay and reinstating Ruroede to inactive status. Relying principally on *N.J.S.A.* 40A:14–149.1 (allowing for suspension without pay for certain misconduct), the Borough maintains that the suspension without pay was appropriate given the circumstances surrounding the altercation. Also, the Borough labels the remedy "extraordinarily onerous and impracticable" considering the Police Department must pay two employees—a replacement officer and Ruroede—for the same job pending a final resolution.

## B.

Ruroede argues primarily that the trial court had the authority to award back pay under *N.J.S.A.* 40A:14–151, and to reinstate Ruroede to inactive status pending a final resolution. Additionally, Ruroede maintains that the trial court properly exercised its authority to conduct a de novo hearing and vacate the termination. In his view, the trial court's one-day hearing was sufficient even though there was no additional testimony. Further, Ruroede maintains that he was denied due process during the municipal disciplinary hearing and that vacating the termination was appropriate.

## III.

## A.

We begin our analysis with a discussion of the statutory framework concerning this dispute. Specifically, we consider the rele-

vant statutes governing disciplinary proceedings for police officers in non-civil service municipalities. *N.J.S.A.* 40A:14–147 to –151.

The primary goal of statutory analysis is to glean the Legislature's intent. *State v. Rangel,* 213 *N.J.* 500, 508, 64 *A.*3d 558 (2013); *State v. Gelman,* 195 *N.J.* 475, 482, 950 *A.*2d 879 (2008). When determining legislative intent, we begin by looking to the plain language of the statute, "giving words 'their ordinary meaning and significance.'" *Rangel, supra,* 213 *N.J.* at 509, 64 *A.*3d 558 (quoting *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005)). "We do not view words and phrases in isolation, but rather in their proper context and in relationship to other parts of a statute, so that meaning can be given to the whole of an enactment." *Ibid.* Furthermore, statutory analysis is conducted under the presumption that the Legislature created a logical scheme that should be interpreted to avoid contradictions. *See State v. Hudson,* 209 *N.J.* 513, 542, 39 *A.*3d 150 (2012). If a statute's plain language is not sufficient to determine legislative intent, then other extrinsic aids, such as legislative history, can be used to analyze a particular statute. *See Gelman, supra,* 195 *N.J.* at 482, 950 *A.*2d 879.

According to the plain language of the statutory scheme under review, a police officer cannot "be suspended, removed, fined or reduced in rank" without "just cause." *N.J.S.A.* 40A:14–147. An officer cannot be removed "for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations." *Ibid.* As such, a police department has the burden of filing "a written complaint setting forth the charge or charges against such ... officer." *Ibid.* An officer is entitled to a hearing on the charges but "may waive the right to a hearing and may appeal the charges directly to any available authority specified by law or regulation." *Ibid.*

Prior to a hearing, an officer may be suspended from his position with or without pay. *N.J.S.A.* 40A:14–149 to –149.1.

[I]f a grand jury returns an indictment against said officer, or said officer is charged with an offense which is a high misdemeanor or which involves moral

turpitude or dishonesty, said officer may be suspended from his duties, without pay, until the case against him is disposed of at trial, until the complaint is dismissed or until the prosecution is terminated.

[*N.J.S.A.* 40A:14–149.1.]

If the officer is ultimately "found not guilty at trial, the charges are dismissed or the prosecution is terminated, said officer shall be reinstated to his position and shall be entitled to recover all pay withheld during the period of suspension." *N.J.S.A.* 40A:14–149.2. Additionally, when an officer is suspended, a hearing on the charges must "be commenced within 30 days from the date of the service . . . of the complaint." *N.J.S.A.* 40A:14–149.

■ For purposes of the disciplinary hearing, a hearing officer has "the power to subpoena witnesses and documentary evidence," and "the Superior Court shall have jurisdiction to enforce any such subpoena." *N.J.S.A.* 40A:14–148. Moreover, the charges must be established by a preponderance of the evidence. *Phillips, supra,* 117 *N.J.* at 575, 569 *A.*2d 807.

If the charges are upheld at the conclusion of a disciplinary hearing, an officer can seek review from the Superior Court. *N.J.S.A.* 40A:14–150. "The court shall hear the cause de novo on the record below and may either affirm, reverse or modify such conviction." *Ibid.* And, "[e]ither party may supplement the record with additional testimony subject to the rules of evidence." *Ibid.* When an officer has been removed from his position, "the court may direct that he be restored to such office, employment or position." *Ibid.* Finally, when a suspension or dismissal is "judicially determined to be illegal, [an] officer shall be entitled to recover his salary from the date of such suspension or dismissal." *N.J.S.A.* 40A:14–151.

### B.

As a threshold matter, we find the plain language of the relevant statutes to be clear. The disciplinary system contemplated by the Legislature provides a police officer with well-defined procedures for an efficient and fair hearing process on alleged

charges against the officer. The hearing must commence promptly, and the burden of proving the charges is on the police officer's employer. *N.J.S.A.* 40A:14–147. The officer is provided with multiple opportunities to have the relevant evidence reviewed and to present his or her own evidence to ensure a fair and meaningful result: an officer can elect to submit to a disciplinary hearing before a neutral party instead of having a departmental hearing, *see ibid.;* an officer can seek a de novo review and supplement the evidentiary record in Superior Court, *see N.J.S.A.* 40A:14–150; and an officer can seek reinstatement or back pay depending on the eventual outcome, *see N.J.S.A.* 40A:14–149, –149.1, –151. Finally, an officer has the opportunity for appellate review in accordance with the Court Rules governing practice before the Appellate Division, *see R.* 2:2–3(a), or this Court, as in the present appeal, *see R.* 2:12–3.

In *Phillips, supra,* we addressed that disciplinary scheme in the context of reviewing charges brought against a police officer who was involved in a drunk driving car crash. 117 *N.J.* at 569, 569 *A.*2d 807. The township held a hearing on the complaint, soliciting testimony from the officer, the officer's expert witnesses, and the township's expert witness. *Id.* at 572–73, 569 *A.*2d 807. At the conclusion of the hearing, the township committee found the officer "guilty by a preponderance of the evidence of three charges but dismissed [one] count." *Id.* at 573, 569 *A.*2d 807. The officer appealed, seeking a de novo review in Superior Court pursuant to *N.J.S.A.* 40A:14–150. *Ibid.* The Superior Court reviewed the disciplinary record, found the officer guilty on a single count, and dismissed the other charges. *Id.* at 574, 569 *A.*2d 807. On appeal, the Appellate Division reversed and dismissed the entirety of the charges. *Ibid.*

Our review of the matter stressed that, in a disciplinary hearing, "it is necessary to establish the truth of the charges only by a preponderance of the evidence." *Id.* at 575, 569 *A.*2d 807. Addressing "the scope of review of each tribunal considering the disciplinary charges brought against" the officer, we explained

that the primary purpose underlying *N.J.S.A.* 40A:14–150 is "to provide employees of non-civil service communities with an independent tribunal to review their disciplinary actions." *Id.* at 577–78, 569 *A.*2d 807. The legislative determination to provide for de novo review through *N.J.S.A.* 40A:14–150 "provides [the Superior Court] with the opportunity to consider the matter 'anew, afresh [and] for a second time.'" *Id.* at 578, 569 *A.*2d 807 (quoting *Romanowski v. Brick Twp.*, 185 *N.J.Super.* 197, 204, 447 *A.*2d 1352 (Law Div.1982), *aff'd o.b.*, 192 *N.J.Super.* 79, 469 *A.*2d 85 (App.Div.1983)). "In a *de novo* proceeding, a reviewing court does not use an abuse of discretion standard, but makes its own findings of fact." *Ibid.* (internal quotation marks omitted).

 We also explained that "[c]onducting the review *on the record* and without the benefit of live testimony does not alter the standard." *Id.* at 579, 569 *A.*2d 807 (emphasis in original). Instead, a reviewing court can reverse, affirm, or modify a disciplinary conviction under its broad authority. *Ibid.* "Although a court conducting a *de novo* review must give due deference to the conclusions drawn by the original tribunal regarding credibility, those initial findings are not controlling." *Ibid.* Rather, the court reviewing the matter de novo is called on to "make reasonable conclusions based on a thorough review of the record. That process might include rejecting the findings of the original tribunal." *Id.* at 580, 569 *A.*2d 807. In sum, the additional layer of review underscores "the fundamental purpose" of having an independent, neutral, and unbiased forum review the disciplinary conviction. *Ibid.*

### C.

 An independent review of the quantum and quality of the evidence presented in the disciplinary hearing at the municipal level did not occur before the Law Division. The Law Division did not review the evidence to determine whether sufficient, competent evidence supported the charges against Ruroede. *See N.J.S.A.* 40A:14–150. The Law Division's attention was diverted

by the fact that this record did not include oral testimony from Egbert concerning the altercation, even though Ruroede admitted that a physical altercation did indeed occur when the police initially investigated the matter, which was memorialized in an internal affairs report to the Chief of Police, and admitted it again at the hearing on direct and cross-examination. The Law Division declared that the failure to produce a live witness to the altercation at the hearing violated Ruroede's due process rights.

No doubt, having competent, non-hearsay evidence from Egbert or one of the other eyewitnesses to the altercation would have rounded out this record. But, in these circumstances, Ruroede admitted that an altercation took place. His previous admission is competent evidence that was part of the Borough's case in chief, *see N.J.R.E.* 803(b)(1) (hearsay exception for statement by party-opponent), in addition to his own testimony at the hearing. The failure to call Egbert did not present a due process violation. Moreover, we note that Ruroede could have sought to subpoena additional witnesses. *See N.J.S.A.* 40A:14–148. He chose not to do so.

The charges and evidence against Ruroede covered a range of infractions but shared a common origin with the altercation that took place between Egbert and Ruroede the night of March 23, 2008.[5] In assessing Ruroede's actions in connection with that admitted altercation, the failure to call Egbert as a witness as to what started the altercation created a deficiency in

---

[5] Although an unfit-for-duty charge was not advanced, the Borough presented Dr. Schievella's psychological report in the event the hearing officer had recommended Ruroede's reinstatement. Therefore, it was relevant evidence. The opinion was admitted by consent into evidence, and it was not a net opinion. *See Pomerantz Paper Corp. v. New Cmty. Corp.*, 207 *N.J.* 344, 372, 25 A.3d 221 (2011) ("[A]n expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered."). An expert must "give the why and wherefore that supports the opinion, rather than a mere conclusion." *Ibid.* (internal quotation marks omitted). Dr. Schievella provided the whys and wherefores to support his opinion.

the record—but not one that can be deemed a denial of due process. Ruroede suffered no due process deprivation even though he was unable to confront Egbert about who started the altercation. *See Dolan v. City of East Orange,* 287 *N.J.Super.* 136, 144, 670 *A.*2d 587 (App.Div.1996) (explaining that, in disciplinary hearings, "the right of confrontation and cross-examination is not part of the panoply of procedural safeguards required by federal or state constitutions").[6] Cronin, who prepared the internal affairs investigative report, which included Ruroede's admission of an altercation, in fact did testify. The lack of direct testimony from Egbert must be evaluated from the perspective of whether there existed sufficient, competent evidence in this record to sustain the charges. Ultimately, who started the altercation proves not to be an ultimate fact essential to substantiate the charges against Ruroede.

We have explained that "a fact finding or a legal determination cannot be based on hearsay alone. Hearsay may be employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony." *Weston v. State,* 60 *N.J.* 36, 51, 286 *A.*2d 43 (1972). But, in reviewing a hearing officer's decision, we must ensure there is "a residuum of legal and competent evidence in the record to support it." *Ibid.* The residuum rule does not require that each fact be based on a residuum of legally competent evidence but rather focuses on the ultimate finding or findings of material fact. *See Mayflower Sec. Co., Inc. v. Bureau of Sec.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). The competent evidence standard applied to ultimate facts requires affirmance if the finding could reasonably

---

[6] Granted, in *Dolan, supra,* the Appellate Division did find that the plaintiff was denied a fair hearing because the accusatory letter at issue was "the sole evidence relied on by the hearing officer," and the plaintiff did not have the opportunity to confront or cross-examine the letter's author. 287 *N.J.Super.* at 145, 670 *A.*2d 587. However, we view that case as distinguishable because, here, the bulk of the evidence supporting Ruroede's termination comes directly from Ruroede's own statements.

be made. *See ibid.* (explaining application of standard of review to ultimate facts when no agency expertise is involved).

Separately, we reject any notion that the manner in which the proceedings took place on the last day of the hearing constituted a deprivation of due process. Ruroede determined to proceed without counsel and to represent himself. Although this Court has recognized that a person facing disciplinary charges generally has a right "to be advised by counsel, if he chooses," *Nicoletta, supra,* 77 *N.J.* at 166, 390 *A.*2d 90, it was Ruroede's choice to proceed without representation, as the Appellate Division acknowledged. Additionally, we note that our opinion rests solely on evidence adduced while Ruroede, in fact, was represented by counsel.

Finally, faced with the arguments about the state of the record before it, remanding for a new disciplinary hearing was not an appropriate remedy for the Law Division under *N.J.S.A.* 40A:14–150. The court could have allowed for the supplementation of the record by either party, but the statutory scheme envisioned that disciplinary proceedings be brought to a prompt conclusion, for the sake of the public, the employer, and the charged individual. The record, as it existed, or as it was allowed to be supplemented in the de novo proceeding, should have been evaluated, and the disciplinary action should have been brought to a conclusion at the trial level. *See, e.g., Cosme v. Borough of E. Newark Twp. Comm.,* 304 *N.J.Super.* 191, 201, 698 *A.*2d 1287 (App.Div.1997) (explaining trial court's "plenary" power to " 'affirm, reverse or modify' the decision reached on the municipal level" (quoting *N.J.S.A.* 40A:14–150)), *certif. denied,* 156 *N.J.* 381, 718 *A.*2d 1210 (1998).

The record that was established is one with which Ruroede and reviewing courts must work. The Law Division should have reviewed that record and determined whether there was a residuum of competent evidence to sustain the charges that the Borough brought against Ruroede. Although the Law Division did not perform that review, the record can be reviewed at this time, and

we choose to do so pursuant to our authority under *Rule* 2:10–5 (allowing for exercise of original jurisdiction) in order to resolve this controversy. Because we exercise original jurisdiction, we review the record to determine whether there is sufficient, competent evidence to prove the charges against Ruroede by a preponderance of the evidence. *See Phillips, supra,* 117 *N.J.* at 575, 569 *A.*2d 807. Accordingly, we turn to the evidence in the record before the Law Division.

## IV.

■ Much of the evidence submitted on behalf of the Borough came in the form of written documents, unsupported by any oral testimony. Although the statements from Egbert, Ruales, and Simpson were admitted during the hearing as documents appended to the internal investigative report, the statements themselves remained hearsay. *See State v. Lungsford,* 167 *N.J.Super.* 296, 310, 400 *A.*2d 843 (App.Div.1979) (explaining that witness statements embedded in police report are not admissible under business record exception to hearsay rule even though report itself may be admissible). As hearsay, they could be used to corroborate competent evidence, but they could not provide the residuum of competent evidence that must support a fact material to the determination of a charge. *See Weston, supra,* 60 *N.J.* at 51, 286 *A.*2d 43. It is the duty of the finder of fact, no matter the forum chosen for a police disciplinary proceeding, to point to the competent evidence in the record supporting his or her ultimate fact-findings and conclusions drawn therefrom. The record before the hearing officer in this matter should have been scrutinized in that manner.

Turning to the competent evidence supplied through Ruroede's testimony during the hearing and in his initial statement made during the Police Department's investigation (later contradicted in a second official statement), which was properly admitted under *N.J.R.E.* 803(b)(1) (hearsay exception for statements made by party-opponent), his statements reveal the following: he was at

Blarney Station while he was supposed to be on sick leave; he was at the scene of the altercation with Egbert; due to whatever verbal exchange ensued, he conceded that he became involved in a public altercation with Egbert; and he conceded that he displayed his official police badge and that he was carrying a weapon. Although he admits to carrying a knife rather than a firearm, he nonetheless admitted to carrying a weapon under his shirt and to lifting his shirt in a display toward Egbert during the dispute. And, he conceded making threatening comments to Egbert, "br[eaking] his hold," "grabb[ing] his jacket," and "push[ing] him away." That evidence was competent, and it was sufficient to support the ultimate facts necessary to sustain the Borough's charges that Ruroede engaged in inappropriate conduct unbecoming a police officer. The evidence supported that Ruroede violated departmental rules and regulations governing the behavior of police officers. *See* Police Department Rules and Regulations 3:1.1 (Standard of Conduct), 3:1.12 (Obedience to Laws and Regulations), 3:10.1 (Conduct Towards Public); Conduct Unbecoming a Police Officer; Disorderly Conduct; Willful Violation of Rules and Regulations; Dishonesty and Untruthfulness.

It is not material whether we accept Egbert's or Ruroede's version of how the altercation began. The differences between the two pale in comparison to the bigger picture: the proofs in this record establish that Ruroede acted inappropriately for a person holding the public trust as a police officer and public employee. Ruroede had more than twenty-three years of experience with the Police Department. He had been a superior officer. We can reasonably infer that he had enough experience working under relevant police rules and regulations to avoid physically grabbing anyone, displaying his police credentials during such a dispute, or carrying a weapon, all while on sick leave. Additionally, Ruroede knew, or should have known, not to make inconsistent statements during the course of the internal affairs investigation, calling into question his honesty, integrity, and truthfulness, essential traits for a law enforcement officer. His dishonesty—providing conflicting statements to investigators about the alterca-

tion—is significant. In sum, the Borough's proofs were sufficient to prove the charges by a preponderance of the evidence, and the charges support the termination of his employment as a police officer.

## V.

In view of our reversal of the judgment, which reversed and remanded this matter for a new disciplinary proceeding, we need not address the trial court's determination to place Ruroede on "inactive status" with back pay. We note only that the statutes governing police disciplinary actions are designed to promote prompt review to avoid unnecessarily long suspensions without pay and to avoid inappropriate fiscal burdens on local authorities. The Appellate Division stayed the Law Division Order granting Ruroede back pay; thus, no additional review is necessary.

## VI.

The judgment of the Appellate Division is reversed. Ruroede's termination is affirmed based on our review of the municipal disciplinary hearing record. The matter is remanded to the Law Division for entry of any and all dispositional orders consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, HOENS and PATTERSON, and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—6.

*Opposed*—None.

*Not participating*—Justice ALBIN—1