**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3546-18T1

IN THE MATTER OF
DAWN SHYNER,
LIEUTENANT #5217

_____

Submitted July 14, 2020 – Decided September 1, 2020

Before Judges Sabatino and Susswein.

On appeal from the New Jersey Division of State Police, Docket No. 2015-0002.

Attorneys Hartman Chartered, attorneys for appellant Dawn Shyner (Mark Alan Gulbranson, Jr., on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey State Police (Jane C. Schuster, Assistant Attorney General, of counsel; Dipti Vaid Dedhia, Deputy Attorney General, on the brief).

PER CURIAM

Appellant, Dawn Shyner, is a Lieutenant in the New Jersey State Police (the Division). She appeals the Division's final agency decision, issued by the Acting Superintendent, finding she committed two disciplinary violations and

imposing a forty-day suspension. Both violations involve lack of candor during an internal affairs investigation. Shyner was charged with being untruthful when she represented to an internal affairs detective that she was not aware that an earlier investigation had been classified as a domestic violence investigation as distinct from a "reportable incident" investigation. She also was charged with refusing to divulge the identities of other troopers she claimed had operated State Police vehicles while on restricted duty in violation of a State Police Standing Operating Procedure (SOP). The Administrative Law Judge (ALJ) who presided over the evidentiary hearing recommended that these charges be dismissed. The ALJ had found that some of the testimony presented by the Division was not credible.

After carefully reviewing the record in view of the applicable legal principles, we are constrained to reverse the Acting Superintendent's determination that Shyner lied when she claimed that she was not aware she had been the principal of a domestic violence investigation. The Acting Superintendent has not offered adequate justification for rejecting the ALJ's findings that were based on the judge's firsthand assessment of witness credibility. We believe the remaining evidence relating to that charge, viewed in its entirety, is insufficient to prove Shyner willfully lied. Accordingly, we

vacate that violation.   We affirm, however, the Acting Superintendent's conclusion that Shyner improperly refused to divulge the identities of other troopers who operated State Police vehicles in violation of an SOP.  We remand the matter for the Acting Superintendent to determine the appropriate penalty for the single violation we affirm.

I.

We presume the parties are familiar with the procedural history of this matter and the facts that were adduced at the evidentiary hearing.  Much of that evidence pertains to a charge that Shyner operated an unmarked State Police vehicle while on weapons-restricted duty.  The Acting Superintendent dismissed that charge, and it is not before us.  We therefore briefly summarize only those circumstances we deem to be pertinent to the issues raised on appeal.

In the fall of 2014, Shyner called 911 for assistance with an altercation involving her estranged husband.  Local police were dispatched to Shyner's residence.  No one was arrested, no criminal charges were ever filed, and no domestic violence temporary restraining order was ever sought or issued.

In accordance with State Police protocols, Shyner immediately notified her superiors of the incident.  The following day, Shyner met with two superior officers in a State Police parking lot at which time she surrendered her firearm

and executed a "Written Acknowledgement of Law Enforcement Obligations." The form acknowledged that her "police issued firearm has been seized by order of the Superintendent." During that meeting, her supervisor told her that he did not believe the incident would "reach[] the level of a DV [domestic violence investigation]."

Thereafter, the domestic violence officer in the Division's Office of Professional Standards (OPS) was assigned to conduct an investigation. That investigation was delayed for several months due to scheduling conflicts between Shyner and the OPS investigator. In the course of that investigation, Shyner advised the OPS investigator she had met with the Division's physician on her own initiative and that the doctor referred her to a counselor from the Division's Employee Assistance Program (EAP). The parties dispute whether Shyner was ever told the OPS investigation was considered to be a domestic violence investigation.

The Division thereafter received a citizen complaint against Shyner for unsafe driving and for operating a State Police vehicle while on restricted duty. The investigation of the civilian complaint was conducted by a detective assigned to the Division's Internal Affairs Unit. During the course of her interviews with the internal affairs detective, Shyner stated that she did not know

4

that she had been the principal of a domestic violence investigation. Rather, she claimed that she believed it was a "reportable incident" investigation.[1] Shyner also claimed that she was not aware that an SOP prohibited troopers on restricted duty from operating a State Police vehicle. In support of that assertion, she claimed that she knew of "many members who have had their guns confiscated but operated troop transportation."

Shyner had never reported those members pursuant to an SOP that requires a trooper to report the misconduct of another trooper.[2] She refused repeated requests by the internal affairs detective to identify the troopers she claimed had operated State Police vehicles while on restricted duty. Shyner

---

[1] The record does not indicate the significance of the distinction between a "reportable incident" investigation and a domestic violence investigation. We note that unlike a criminal prosecution for perjury under N.J.S.A. 2C:28-1, an administrative prosecution for violation of SOP B10, see infra note 4, does not require proof that a false statement was material to the underlying internal affairs investigation.

[2] That SOP provides:

> A member who receives information that any other member may have violated the Rules and Regulations or may have engaged in any of the forms of misconduct identified in Section IV of this order, must report such information to the OPS or through their chain of command as provided in this order.

asserted that to do so would violate the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d-1 to -9 (HIPAA).

In May 2016, Shyner was charged with three violations: (1) unauthorized use of a troop car after surrendering her assigned firearm, SOPs C18 and D17; (2) failing to report violations committed by other troopers and failing to divulge requested information about those violations, SOP B10; and (3) failure to provide full and candid answers during the course of an internal investigation by claiming she was unaware she had been the principal of a domestic violence investigation, SOP B10.[3]   The matter was referred to the Office of Administrative Law (OAL) as a contested case.

After conducting a two-day evidentiary hearing, the ALJ issued an initial decision recommending that all three charges be dismissed. With respect to the first charge, the ALJ found that "OPS never advised Shyner of the SOPs that

---

[3]  SOP B10 provides:

> All members of the Division are obligated to answer questions and provide full and complete information to investigating officers during internal investigations. Less than complete candor during any statement may lead to serious disciplinary sanctions, which may include suspension or termination.

prevented her from driving her NJSP assigned vehicle from October 5, 2014 through January 7, 2015."

The ALJ then turned to the allegations that Shyner failed to provide complete and truthful answers during an internal affairs investigation. As noted, the ALJ had already found that Shyner did not know that operating a troop car while on restricted duty was prohibited. The ALJ thus reasoned that Shyner did not recognize the conduct of other troopers who drove State Police vehicles while on restricted duty as a violation that had to be reported. The ALJ also found that Shyner was concerned that her disclosure of the identities of those other troopers in response to requests made during the internal affairs investigation might be a violation of HIPAA. The ALJ thus determined that Shyner had not violated the SOP that requires troopers to give full and candid answers to questions posed during an internal investigation.

Finally, the ALJ addressed the charge that Shyner provided false or misleading statements to the internal affairs detective when she claimed to be unaware that she had been the principal of a domestic violence investigation. The ALJ found that Shyner's emails demonstrated that she had been "proactive upon returning to work" and that she had met with the Division physician on her own initiative and without being ordered to do so. The ALJ further found that

the Division physician referred her to the EAP counselor and that she had not been ordered to meet with the counselor in connection with a domestic violence investigation. Although emails from the OPS investigator to his superiors indicated the OPS investigation indeed related to domestic violence, the ALJ found there is no evidence those emails were shared with Shyner.

The ALJ further noted the Division relied in part upon the EAP counselor's statement that "it would be impossible for a member to leave a meeting with her and not know their internal investigation was classified as a DV incident." The counselor did not testify at the hearing. Her statement instead was presented through the testimony and report of the OPS investigator who conducted the initial investigation. The ALJ recognized that hearsay may be considered in administrative proceedings, N.J.A.C. 1:1-15.1(c); N.J.A.C. 1:1-15.5(a), so long as other credible supporting evidence is admitted. See Weston v. State, 60 N.J. 36, 51 (1972) (permitting the employment of hearsay to "corroborate competent proof" but requiring "a residuum of legal and competent evidence in the record" to support an administrative decision on review (citations omitted)). The ALJ found there was no such corroborating evidence to support the counselor's statement and on that basis, the ALJ found it to be unreliable and gave it no weight.

A-3546-18T1

Importantly, the ALJ also rejected the Division's evidence that on multiple occasions, the OPS officer assigned to her case had expressly told Shyner that the investigation was considered to be a domestic violence investigation. The ALJ found that testimony was not credible based on the witness's demeanor and evasive answers during cross-examination. In contrast, the ALJ credited undisputed evidence that during the meeting at which she surrendered her service weapon, Shyner was told by her captain that he did not believe the ensuing investigation would reach the level of a domestic violence investigation.

Based on all of those circumstances, the ALJ concluded that the Division had not proved by a preponderance of the credible evidence that Shyner was willfully untruthful when she stated that she was unaware that she was the principal of a domestic violence investigation and believed instead that she had been the subject of a reportable incident investigation.

The Division filed exceptions to the ALJ's decision. The Acting Superintendent modified the ALJ's recommendation on charge one but agreed ultimately that charge should be dismissed. The Acting Superintendent rejected the ALJ's recommendations on the two remaining charges, determined that Shyner had committed those infractions, and imposed a forty-day suspension.

Shyner contends the Superintendent has not explained why he disregarded the ALJ's findings and witness credibility determinations. Regarding the second charged violation, she maintains the Acting Superintendent failed to adequately explain why he rejected the ALJ's finding that Shyner was concerned disclosure of the identities of the other officers who drove their vehicles while on restricted duty could violate HIPAA. She claims the Acting Superintendent's reasoning—that the Division did not seek confidential medical information protected by HIPAA—ignores the Division's failure to present that argument to the ALJ or to present any evidence in support of that argument. Moreover, Shyner argues the Acting Superintendent's determinations on her first and second charged violations contradict one another. In finding the first charged violation unfounded, the Acting Superintendent concluded Shyner was unaware that driving her trooper vehicle while on restricted-duty status was a violation of the Rules and Regulations. Yet, the Acting Superintendent also found Shyner violated her obligation to report other officers for that same conduct. Accordingly, Shyner contends the final agency decision with respect to the second charge constitutes an abuse of discretion and should be overturned.

Shyner also maintains the Acting Superintendent acted arbitrarily and capriciously in rejecting the ALJ's credibility findings and concluding that Shyner committed a candor violation in claiming to be unaware, prior to January 2015, that she was the principal of a DV investigation. She argues that no credible evidence was presented showing that she was informed her matter was being treated as a DV investigation. She notes her Captain told her directly that he did not believe the incident would amount to a DV investigation. Shyner also claims the Acting Superintendent's reliance on the OPS officer's testimony ignores the ALJ's finding that the officer's live testimony lacked credibility. Accordingly, Shyner submits her violation for lacking candor during the course of the internal investigation should be vacated.

### III.

We begin our analysis by emphasizing that law enforcement officers are held to a high standard of professionalism and integrity. See In re Phillips, 117 N.J. 567, 576 (1990) (noting that the police are a "special kind of public employee" who, accordingly, are expect to "present an image of personal integrity and dependability" (quoting Twp. of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965))). This includes exercising candor at all times, and certainly during the course of an internal investigation. An officer's

dishonesty in an internal affairs investigation "is significant." Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 363 (2013). Although we firmly embrace the high standard of honesty and integrity to which state troopers and all law enforcement officers must be held, that standard does not shift the Division's burden in disciplinary cases to prove an alleged violation by a preponderance of the credible evidence. Id. at 355 (citing In re Phillips, 117 N.J. 567, 575 (1990)).

The scope of our review of an administrative agency's final decision is limited. In re Hermann, 192 N.J. 19, 27 (2007). The "final determination of an administrative agency . . . is entitled to substantial deference." In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 541 (2016) (citing Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007)); see also In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (finding a "strong presumption of reasonableness attaches to the actions of the administrative agencies" (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993), aff'd, 135 N.J. 306 (1994))). An appellate court ordinarily "should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by

substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008); see also Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (noting the abuse-of-discretion standard is established "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis'" (quoting Achacoso-Sanchez v. Immigration & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985))).

When a contested case is submitted to the OAL for a hearing, the agency head must review the record submitted by the ALJ and give attentive consideration to the ALJ's initial decision. N.J. Dep't of Pub. Advocate v. N.J. Bd. of Pub. Utilities, 189 N.J. Super. 491, 500 (App. Div. 1983). The agency head nonetheless remains the primary factfinder and maintains the ultimate authority to reject or modify findings of fact, conclusions of law, or interpretations of agency policy. Id. at 507 (citing N.J.S.A. 52:14B-10(c)). In State Police disciplinary cases, the Superintendent, not an ALJ, ultimately has the managerial prerogative to determine whether a trooper violated the Division's rules and regulations, as well as the penalty to be imposed. State v. State Troopers Fraternal Ass'n, 134 N.J. 393, 416–17 (1993).

Even so, ALJs are not mere conduits for transmitting evidence to the agency head, and they should not be considered "second-tier players or hold an inferior status as factfinders."  In re Hendrickson, 235 N.J. 145, 160 (2018). Accordingly, when an agency head strays from the factual findings of an ALJ, we need not accord the agency head the level of deference we ordinarily recognize in reviewing final administrative decisions.  See H.K. v. State of N.J. Dep't of Human Servs., 184 N.J. 367, 384 (2005) (noting that it is "not for . . the agency head to disturb" ALJs' credibility determinations based upon live witness testimony); Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587–88 (1988) (declining to defer to the agency head's assessment of witness credibility when the ALJ was the one who heard live testimony).   Furthermore, and of special significance in this appeal, an agency head may not reject or modify findings of fact as to issues of credibility of lay witness testimony unless the agency head first determines from a review of the record that the ALJ's findings "are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record." N.J.S.A. 52:14B-10(c); accord N.J.A.C. 1:1-18.6(c).

IV.

We first address the charge that Shyner lied when she told an internal affairs detective that she did not believe that she had been the principal of a domestic violence investigation. The issue before us is not whether the Division classified the OPS inquiry as a domestic violence investigation. Clearly, they did. Rather, the disputed question at the heart of this case is whether Shyner was aware of that designation.

Shyner's alleged awareness of the nature of the OPS investigation is a subjective state of mind that can be proved either by direct or circumstantial evidence. See Mayflower Indus. v. Thor Corp., 15 N.J. Super. 139, 162 (Ch. Div. 1951), aff'd o.b., 9 N.J. 605 (1952) ("[A] person's intentions . . . need not be proved from what he said[] but . . . may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation."). As to direct evidence, the Division presented testimony that on multiple occasions, the OPS investigator told Shyner he was conducting a domestic violence investigation and that she was the principal of that investigation. If believed, that testimony would conclusively establish the lack-of-candor violation. However, the ALJ found that testimony was not credible

based on the ALJ's firsthand observation of the witness's demeanor during cross-examination.

The Acting Superintendent's final decision relies upon this evidence but makes no mention of the ALJ's adverse credibility assessment. The Acting Superintendent, in other words, has not presented an explanation, as required by N.J.S.A. 52:14B-10(c) and N.J.A.C. 1:1-18.6(c), for concluding that the ALJ's credibility finding is arbitrary, capricious or unreasonable or is not supported by sufficient, competent, and credible evidence in the record.

Nor does the Acting Superintendent's final agency decision explain why the ALJ abused her discretion in discounting the hearsay statement attributed to the EAP counselor who claimed "it would be impossible for a member to leave a meeting with her and not know their internal investigation was classified as a DV incident." We add that the counselor's statement does not declare that she told Shyner the OPS investigation was designated as a domestic violence investigation. Rather, the counselor's statement is essentially a lay opinion drawn from the circumstances of her meeting with Shyner.

We infer from the counselor's hearsay statement that they discussed domestic violence and marital discord during the counseling session. That does not mean, however, they discussed Shyner's awareness of the designation of the

16

internal investigation, that is, whether Shyner was a principal in a domestic violence investigation or a reportable incident investigation. Nor did the Division present evidence that the counselor knew that Shyner's supervisor had told her that he believed the matter would not reach the level of a domestic violence investigation.

We recognize that, at first glance, it might seem implausible on its face that Shyner was not aware she was the principal of a domestic violence investigation given that she had called 911 and surrendered her service weapon the next day. The Division argues Shyner's claim that she was unaware that she was a principal in a domestic violence investigation is undercut by her compliance with all the steps required of a trooper who is the principal in a domestic violence investigation. As we have noted, the Division could prove Shyner's awareness of the classification of the investigation from the surrounding circumstances, including the steps she took from the outset that are consistent with the steps that would be taken by the principal of a domestic violence investigation. Those circumstances, however, must be viewed in their entirety.

Because the Acting Superintendent has not complied with the requirements of N.J.S.A. 52:14B-10(c) and N.J.A.C. 1:1-18.6(c) before

17

rejecting the ALJ's lay witness credibility findings, we disregard the testimony the ALJ found was not credible. The remaining evidence, in our view, supports the conclusion that Shyner subjectively, albeit erroneously, believed the OPS investigation was deemed to be reportable incident investigation rather than a domestic violence investigation. That exculpatory evidence includes that no one was ever arrested or charged with domestic violence and no domestic violence temporary restraining order was ever sought or issued. Furthermore, the OPS investigation was not completed expeditiously as one might expect when a trooper is the principal of a domestic violence internal investigation.

Most importantly, at the time Shyner surrendered her service weapon, her captain told her that he did not believe the matter would reach the level of a domestic violence investigation. That statement of reassurance by Shyner's supervisor reasonably suggests the Division's classification of the ensuing investigation was not a foregone conclusion or, at least, suggests that Shyner might subjectively believe a domestic violence classification was not inevitable.[4] We note the Division did not present evidence that the captain's statement to Shyner was inappropriate.

---

[4] It is conceivable Shyner acted swiftly and preemptively, e.g., by reaching out to the Division's physician before being ordered to do so, in the hope of

The ALJ concluded that Shyner was never told after that initial meeting that her captain was mistaken and that the investigation had in fact reached the level of a domestic violence investigation. On this critical point, we defer to the ALJ's factual finding because, as noted, the Acting Superintendent in his final decision did not address the ALJ's explicit witness credibility assessment.

Considering all of these circumstances, we are constrained to agree with the ALJ that the Division failed to prove by a preponderance of the credible evidence that Shyner lied when she said she believed the internal investigation pertained to a reportable incident rather than suspected domestic violence. We therefore vacate the Acting Superintendent's ruling on this charge.

V.

We turn next to the charge that Shyner refused to divulge the identities of troopers she knew had operated State Police vehicles after their weapons had been surrendered. The internal affairs investigation in this case focused on whether Shyner had violated Division rules by driving a State Police vehicle

---

influencing the decision as to how the investigation would be classified. We reiterate that the critical issue with respect to this charge is not whether Shyner was objectively reasonable in believing that the investigation would be deemed to be a reportable incident investigation. Rather, the issue is whether she willfully lied when she told the internal affairs detective that she was unaware that the investigation had been classified as a domestic violence investigation.

while she was on weapons-restricted duty. Shyner did not dispute that she operated an unmarked troop car before her service weapon was returned to her. Rather, she claimed by way of defense that she was unaware of the SOP that prohibited her from driving a State Police vehicle.

In support of that defense, Shyner told the internal affairs detective she was aware of plenty of troopers who "are on limited duty, that had their weapons taken away, for medical reasons or other reasons, that still drive troop cars." That statement no doubt was intended to corroborate her assertion that she was unaware such conduct was prohibited. As it turns out, that assertion spun the first thread in a tangled web. The internal affairs detective challenged Shyner to support her assertion by providing the names of those other troopers. Shyner did not reply that she had only heard this information from others and did not know the identities of these troopers. Rather, she refused to reveal their identities to the internal affairs detective, claiming that to do so would violate their privacy rights under HIPAA. She thereby impliedly confirmed that she knew their names.

The ALJ reasoned that because Shyner was unaware that driving a troop car without a service weapon violates an SOP, she had no reason to believe she was required to report other troopers who engaged in the same conduct. That

20

rationale might explain why she did not commit a violation each time she learned another trooper was operating a vehicle while on restricted duty. The ALJ's reasoning, however, does not explain much less justify why Shyner did not answer the direct question put to her by the internal affairs detective after she was told that such conduct is prohibited.

We emphasize the specifications of the alleged violation make clear that Shyner was not just charged with failing to report the other troopers when she first learned of their conduct. Rather, the specifications make clear she also was charged with refusing to divulge information specifically requested by the internal affairs detective.[5] The ALJ's decision does not address this aspect of

---

[5] The specification supporting this charge provides:

> On February 2, 2016, Lieutenant Dawn Shyner #5217 acted to her personal discredit and to the discredit of the Division, when she refused to identify unnamed enlisted members who she had indicated committed misconduct by operating troop transportation while on weapons restriction duty status. Specifically, during a formal principal interview with internal investigators on June 10, 2015, Lt. Shyner stated "There are plenty of troopers that I'm aware of throughout Division that are on limited duty, that had their weapons taken away, for medical reasons or other reasons, that still drive troop cars." Despite this assertion, investigators determined that Lt. Shyner never reported those members to the OPS or the Division as required. During

the charge except to note in conclusory fashion that Shyner asserted that compliance with the detective's demand would violate HIPAA. The ALJ did not consider whether, in fact, Shyner had been asked to disclose confidential information that the Division was prohibited from knowing under HIPAA or any other privacy law.

We conclude Shyner's HIPAA argument is unpersuasive and unavailing. The record clearly shows she was not asked to provide the reasons why the other troopers had been placed on duty status restriction (e.g., medical or psychological problems, suspected domestic violence, suspected alcohol or drug abuse, a police shooting or other use-of-force investigation). And of course, the Division would already be aware why those troopers had been placed on

_____

her third formal principal interview on February 2, 2016, internal investigators directly asked Lt. Shyner to identify the enlisted members that she had knowledge of who had operated troop transportation while on duty status restrictions, however, she refused to identify the members. After this refusal, Lt. Shyner was reminded of her obligation to provide full and complete information to investigating officers but she again refused to identify the enlisted members.

[(Emphases added).]

weapons restricted duty.[6]  In these circumstances, Shyner was obligated to cooperate with internal affairs once she was told driving a troop car while on restricted duty is prohibited and was reminded of her obligation to provide full and complete information to investigating officers.

We conclude the Acting Superintendent acted well within his discretion in rejecting the ALJ's recommendation on this issue and finding that Shyner willfully failed to cooperate with the internal affairs detective and did not provide full and complete responses regarding possible misconduct by other troopers.  This is not an instance in which the Acting Superintendent unjustifiably disregarded an ALJ factual finding.  We therefore affirm that violation.

## VI.

To the extent we have not addressed them, any additional contentions raised by Shyner lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(1)(E).  Because we vacate one of the violations, we remand the matter

---

[6]  As noted, when she surrendered her weapon, Shyner signed a form acknowledging that her "police issued firearm has been seized by order of the Superintendent."  Presumably, that practice was followed in other cases where troopers surrendered their service weapons.

to the Acting Superintendent to determine the appropriate penalty for the single disciplinary infraction we affirm. We do not retain jurisdiction.

Affirmed in part and reversed and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3546-18T1